## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| VICKIE TRANBARGER, | : | |
| | : | **Case No. 2:20-cv-00945** |
| Plaintiff, | : | |
| | : | **CHIEF JUDGE ALGENON L. MARBLEY** |
| v. | : | |
| | : | **Magistrate Judge Deavers** |
| LINCOLN LIFE & ANNUITY COMPANY | : | |
| OF NEW YORK, | : | |
| | : | |
| Defendant. | : | |

## OPINION & ORDER

This matter is before the Court on the parties' cross Motions for Judgment on the Administrative Record. (ECF Nos. 25, 26). For the reasons set forth below, Defendant's Motion for Judgment on the Administrative Record (ECF No. 26) is **GRANTED** and Plaintiff's Motion (ECF No. 25) is **DENIED**.

### I. BACKGROUND

#### A. Factual Background

Plaintiff Vickie Tranbarger worked as an Accounts Receivable Manager for David Feldman Worldwide, Inc. ("DFW") until July 18, 2016. (ECF No. 14-3 at 54). She participated in DFW's long-term disability plan. (*See id.* at 48–49). Defendant, Lincoln Life & Annuity Company of New York ("Lincoln"), serves as the administrator of the long-term disability plan for DFW employees. (*Id.*).

As Accounts Receivable Manager, Tranbarger oversaw, at least, portions of the accounts receivable function. Her specific responsibilities included keeping records of payments to the company; applying those payments; making calls when needed; working with collections agencies as necessary; reconciling the accounts receivable of different business lines; and assisting with

loan reconciliation. (ECF No. 14-3 at 27). According to Defendant's occupational analysis, Tranbarger's work required her to direct, control, and oversee the "activities of others" as well as implement discretionary decision making. (*Id.* at 24).

According to Tranbarger, she was an otherwise healthy and active person until her gallbladder removal in late 2015. (*See* ECF No. 14-3 at 10; ECF No. 14-2 at 507) ("biking 5 days a week"). Upon awaking from that surgery, she suffered a panic attack and increasing anxiety. (*Id.*). Approximately a month and a half after surgery, she received a flu shot. (ECF No. 14-3 at 10). It was around this time she began experiencing issues with her sinuses and increased intensity of her insomnia and panic attacks. (*Id.*). She developed "flu-like symptoms" in December of that year in addition to her a worsening of her existing symptoms. (*Id.*). In January of 2016, Tranbarger experienced "pain [and] tingling in her back, shoulders and back of the legs." (*Id.*). She noted, at that time she felt as if "her whole body was in cement as she was trying to go about her normal daily activities." (*Id.*).

In February 2016, Tranbarger began seeing clinicians at the Mayo Clinic. (*Id.* at 55). There, clinicians prescribed Tranbarger Lexapro and hormone replacement therapy. (*Id.* at 17). Examination notes indicate that she had not been formally diagnosed with depression or anxiety. (*Id.*). Moreover, she had not been previously diagnosed with Fibromyalgia. (*Id.*). She revisited the Mayo Clinic in July that year, where she was seen by healthcare professionals in the Fibromyalgia & Chronic Fatigue Internal Medicine department. (*Id.*).

On July 21, 2016, Nurse McDermott diagnosed Tranbarger with Fibromyalgia and Chronic Fatigue Syndrome ("CFS"). (*Id.* at 20). McDermott recommended the Mayo Clinic's self-management program "which focuses on stress management, sleep hygiene, balanced lifestyle, moderation, energy conservation, and graded exercise." (*Id.*). Yet, because Tranbarger's

insurance did not cover the program, she "referred her for individual education at Mayo's Patient Education Center." (*Id.*). Further, McDermott recommended medication, cognitive behavior therapy, and an "intensive physical and psychological rehabilitation program" through the Mayo Clinic. (*Id.* at 20–21). It is unclear whether Tranbarger's insurance covered that program. (*See id.*).

That same day and over the following week, Tranbarger saw three other healthcare professionals at the Mayo Clinic. (*Id.* at 8–22). After Nurse McDermott, she saw Nurse Stephanie Graham. (*Id.* at 10). Nurse Graham notes that Tranbarger complains of experiencing constant pain of varying intensity and severe fatigue. (*Id.*). Despite having issues sleeping, she reported "no difficulty with memory." (*Id.* at 11). Nurse Graham noted that Tranbarger was currently "working from home in finance … [but] has had to take a temporary leave due to current symptoms." (*Id.*). Moreover, Graham recorded that Tranbarger "describe[d] her current functional status as being very limited in being able to carry out activities of daily living." (*Id.*).

On July 25, 2016, Tranbarger saw Dr. Ann Bell. Dr. Bell clarified that the sickness Tranbarger experienced in December was a sinus infection. (*Id.* at 15). Moreover, Dr. Bell affirmed the diagnosis of Chronic Fatigue Syndrome and additionally diagnosed Tranbarger with Temporomandibular joint dysfunction, nonobstructive deviated nasal septum, and Chronic rhinitis. (*Id.* at 16). Later that day, Tranbarger saw Dr. Nerissa Collins. (*Id.* at 8). Dr. Collins affirmed the diagnoses of CFS and Fibromyalgia and additionally diagnosed her with Postmenopausal bleeding. (*Id.* at 9). Regarding CFS, Collins noted that "Tranbarger would be a good candidate for a three-week pain rehab program." (*Id.*). Further, she remarked that if she can't participate in that program, she recommended that Tranbarger find "a therapist locally who does CBT for anxiety and fibromyalgia." (*Id.*). Finally, Collins recommended that Tranbarger consider physical

therapy.  (*Id.*).  Importantly, no healthcare professional at the Mayo Clinic opined on Tranbarger's functional capacity.

A little over two months later, Tranbarger saw Dr. Charles Swift, her primary care physician for a "follow-up General adult exam."  (ECF No. 14-2 at 499).  There, the attending nurse—Stephanie Fisher—noted that Tranbarger "felt well with minor complaints."  (*Id.*).  Tranbarger also requested a prescription "water therapy."  (*Id.*).  Dr. Swift documented his findings, noting the absence of "[b]ack [p]ain and [j]oint [p]ain" and describing Tranbarger's condition as normal for many tests.  (*See e.g.*, ECF No. 14-2 at 500) ("Chest and Lung Exam … Movements – Normal … Breath sounds – Normal.").  Dr. Swift noted that Tranbarger had "5/5 normal muscle strength – Left Upper Extremity, Left Lower Extremity, Right Upper Extremity and Right Lower Extremity."  (*Id.*).  He noted that Tranbarger was "exercising and willing to try relaxant at night."  (*Id.*).  Dr. Swift did not opine on Tranbarger's functional capacity.  (*See id.*).

A few days later, on October 5, 2016, Tranbarger began seeing Mr. Chris Glenn and Sheldon Chisam for physical therapy.  (ECF No. 14-2 at 476).  As documented in her treatment plan, Tranbarger was supposed to attend physical therapy three times a week for nine to ten weeks.  (*Id.* at 482).  Planned treatment included "aquatic therapy, balance training, gait training, neuromuscular reeducation, patient education, and therapeutic exercises."  (*Id.*).  Ultimately, however, Tranbarger would participate in physical therapy for a total of four sessions over two weeks, eventually opting to cancel any additional sessions.[1]  Although it is unclear why she stopped attending,[2] she does not appear to have participated in physical therapy after October 2016.

---

[1] It appears that Plaintiff had a session scheduled for October 28, 2016 but likely cancelled.  The document notes that "Time Spent With Patient" as "0."  (*See* ECF No. 14-2 at 483).
[2] Her SSA determination noted it was because Tranbarger believed she could recreate the sessions at a fitness center (ECF No. 14-3 at 73), but she represented to Lincoln that it was because it made her condition worse (ECF No. 14-2 at 475).

(*See* ECF No. 14-3 at 475–487). On her initial visit, she had a fifty-five-minute session. (*Id.* at 482). There, Tranbarger reported "constant pain and fatigue." (ECF No. 14-2 at 476). Despite her representations that day, Mr. Glenn rated her "rehabilitation potential" as "fair." (*Id.*). Further, Glenn opined that Tranbarger had the following impairments and limitations: "ambulation deficits, coordination/proprioception deficits, endurance deficits, impaired sensation, range of motion deficits, strength deficits, [and] transfer deficits." (*Id.*). Tranbarger represented that she has "many plans in place to address these issues including exercise, cupping, acupuncture and Tai Chi." (*Id.* at 484).

Two days later, on October 7, 2016, Tranbarger had her second physical therapy session lasting forty-five minutes. (*Id.* at 480). There, she "report[ed] no pain today … [today] is a good day." (*Id.*). Tranbarger completed the following warmup exercises: backward walking, forward walking, lateral walking for a total of five laps. (*Id.*). She then completed the following "lower extremity aquatic therapy" exercises: "heel raises, hip abduction/adduction, hip circles, hip flexion/extension, knee flexion/extension, squat, [and] toe raises," at least ten repetitions of each. (*Id.* at 487).

On October 10, 2016, three days later, she had her third physical therapy session. (*Id.* at 485). There, she noted that she experienced "a lot of soreness and pain after" the last visit. (*Id.*). That said, Tranbarger reported having "no pain" that day. (*Id.*) In addition to repeating the warmup routine and "lower extremity aquatic therapy" from the October 7 session (*See id.* at 480), she biked for 5 minutes and completed the "upper extremity aquatic therapy grid," which consisted of rows, shoulder abduction/adduction, [and] shoulder horizontal abduction/adduction. (*Id.* at 481).

On October 12, 2016, Tranbarger had her fourth and final physical therapy session that lasted forty-five minutes. (*Id.* at 479). She noted—again—that she was experiencing "no pain," just tiredness "after pool and on off days". (*Id.*). For the fourth consecutive time in two weeks, was able to increase her exercise. (*See id.*). She completed her original warmup exercises and added in five minutes of marching. (*Id.*). For her "lower extremity aquatic therapy grid" she kept her original regimen and added the following exercises: forward step up and down for five repetitions and hip alphabet for one repetition. (*Id.* at 486). Just like in the third session, she also biked for five minutes and completed the exercises associated with the "upper extremity aquatic therapy grid." (*Id.*).

On November 11, 2016, Tranbarger saw Dr. Swift, her primary care physician complaining of a "medication reaction." (ECF No. 14-2 at 497). There, she reported having withdrawal symptoms—"fatigue[], headaches, nausea, dizz[iness], and some tremors—following the cessation of her Lexapro prescription. (*Id.*). In addition to those issues, she represented that she "had a hard time with the aquatic aerobics," explaining to the attending nurse that she was experiencing similar symptoms from that as she did with the withdrawal symptoms. (*Id.*). Dr. Swift prescribed her a low dose of Lexapro and opted to "wean slower." (*Id.*).

In February of 2017, Tranbarger saw Dr. Swift again. (*Id.* at 504). This visit was categorized as a "follow-up for Anxiety." (*Id.*). There, she represented she was experiencing "anxiety, fatigue, and irritability," but her symptoms specifically excluded difficulty concentrating. (*Id.*). She indicated that while she was not experiencing "poor sleep" at this time, she did feel "fatigue[d], weakness, irritability, anxiety and depressed mood." (*Id.*). In addition to refilling her prescription for Lexapro, Dr. Swift indicated that "a Rheumatologist appointment will be scheduled for this patient." (*Id.* at 495).

On May 18, 2017, Tranbarger completed another follow-up visit with Dr. Swift.  (*Id.* at 503).  On this occasion, Tranbarger represented that she "feels well with minor complaints."  She also said she "exercised daily (walking)" and was "attempting to increase … exercise amount." (*Id.*).  Her musculoskeletal exam also showed that although she experienced joint pain, she did not experience back pain.  (*Id.*).

Tranbarger then saw Dr. James Wedner in August of 2017.  (*Id.* at 507).  In addition to reiterating what Plaintiff told Dr. Wedner—a truncated version of the facts expressed to Mayo Clinic, Wedner noted that Plaintiff's "fatigue does not directly affect her movements and she does not describe any muscle fatigue at the end of the day, difficulty brushing her hair, or using her arms above her head." (*Id.*).  Moreover, she could now "tolerate[] 21 minutes of activity."  Further, she experienced no muscle pain that day and had "5/5" muscle strength "in all extremities." (*Id.*).

Tranbarger first applied for long-term disability benefits with Lincoln in September 2017. (ECF No. 14-3 at 48–59).  On December 13, 2017, Lincoln denied Tranbarger's claim.  (ECF No. 14-2 at 439–442).  Further, Lincoln denied Tranbarger's initial appeal on October 5, 2018 and her final appeal on July 24, 2019.  (*Id.* at 187, 336).  Notably, during the pendency of Tranbarger's final appeal with Lincoln, the Social Security Administration determined she was Totally disabled and entitled to benefits beginning January 2017.  (*Id.* at 196).

DFW's long term disability policy, as administered by Lincoln, defines "Total Disability" as when a claimant "due to an Injury or Sickness … is unable to perform each of the Main Duties of his or her Own Occupation … [d]uring the Elimination Period and Own Occupation Period." (*Id.* at 97).  Further, following the "Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the Main Duties of any occupation

which his or her training, education or experience will reasonably allow." (*Id.*). A claimant is not entitled to benefits until after the Elimination Period—"defined as 180 days of Disability caused by the same or a related Sickness or Injury, which must be accumulated within a 360 calendar day period"—has lapsed. (*Id.* at 90, 92).

## B. Procedural Background

On February 20, 2020, Vickie Tranbarger filed her Complaint against Lincoln Life & Annuity Company of New York asserting that its denial of her long-term disability claim was in violation of the Employment Retirement Income Security Act, 29 USC § 1132(a)(1)(B). (ECF No. 1). Defendant filed an Answer on July 27, 2020. (ECF No. 7). On August 23, 2021 and September 20, 2021, the parties filed cross-motions for judgment on the Administrative Record. (ECF Nos. 25, 26). Plaintiff timely filed her Response/Reply (ECF No. 28); and Defendant did likewise (ECF No. 29). Finally, on December 06, 2021, Plaintiff filed a Notice of Supplemental Authority (ECF No. 30), to which Defendant filed a timely Response (ECF No. 31). The motions are now ripe for review.

## II. STANDARD OF REVIEW

This Court reviews an ERISA plan administrator's denial of benefits *de novo* "unless the benefit plan gives the administrator discretionary authority to determine eligibility for benefits." *Cox v. Standard Ins. Co.*, 585 F.3d 295, 299 (6th Cir. 2009). If the benefit plan gives the administrator discretionary authority to determine eligibility for benefits, the Court reviews the administrator's decision under the highly deferential "arbitrary and capricious" standard of review. *Id.*

In the Sixth Circuit, "discretion is the exception, not the rule and … the arbitrary and capricious standard does not apply unless there is a *clear* grant of discretion to determine benefits

or interpret the plan." *Wulf v. Quantum Chem. Corp.*, 26 F.3d 1368, 1373 (6th Cir. 1994) (emphasis in original). Consequently, "[t]he party claiming entitlement to review under an arbitrary and capricious standard … has the burden of proving that the standard applies." *Crider v. Highmark Life Ins. Co.*, 458 F. Supp. 2d 487, 501 (W.D. Mich. 2006) (citing *Brooking v. Hartford Life & Acc. Ins. Co.*, 167 Fed. Appx. 544, 547, 2006 WL 357881 (6th Cir. 2006) and *Banner v. Trustmark Ins. Co.*, No. C2-04-1099, 2006 WL 745187, at *7 (S.D. Ohio Mar. 21, 2006)). Because Defendant does not argue that it is subject to the more deferential standard, Plaintiff's eligibility here is subject to the *de novo* standard.

A Court's *de novo* review of a denial of benefits "is to determine whether the administrator ... made a correct decision." *Hoover v. Provident Life and Acc. Ins. Co.*, 290 F.3d 801, 808-09 (6th Cir. 2002). In making this determination, the Court limits its review "to the record before the administrator and the court must determine whether the administrator properly interpreted the plan and whether the insured was entitled to benefits under the plan." *Id.* at 809; *see also Farhner v. United Transp. Union Discipline Income Prot. Prog.*, 645 F.3d 338, 343 (6th Cir. 2011); *Evans v. Metro. Life Ins. Co.*, 190 F. App'x 429, 434 (6th Cir. 2006) ("A court's review of a plan administrator's decision in an ERISA case—whether the court is conducting a de novo review or a review under the arbitrary and capricious standard—must be based solely on the administrative record.") (citations omitted). The Court affords the administrator "no deference or presumption of correctness." *Hoover*, 290 F.3d at 809. Finally, this standard of review "applies to the factual determinations as well as to the legal conclusions of the plan administrator." *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 613 (6th Cir. 1998) (citing *Rowan v. Unum Life Ins. Co.*, 119 F.3d 433, 435 (6th Cir.1997)).

### III.    LAW & ANALYSIS

For a plaintiff to succeed in their claim for disability benefits, she must prove by a preponderance of the evidence that they were disabled as defined by the Plan. *Harrison v. Life Ins. Co. of N. Am.*, No. 2:18-CV-1077, 2020 WL 1030897, at *4 (S.D. Ohio Mar. 3, 2020), *appeal dismissed*, No. 20-3378, 2020 WL 5904432 (6th Cir. Aug. 5, 2020), *and aff'd*, 856 F. App'x 574 (6th Cir. 2021) (citing *Javery v. Lucent Tech. Inc. Long-Term Disability Plan for Mgmt. or LBA Emp.*, 741 F.3d 686, 700-01 (6th Cir. 2014)).

Here, the Plan defines disability as Total Disability or Partial Disability. (ECF No. 14-2 at 95). Moreover, Plaintiff argues that she is Totally Disabled; thus, the Court will focus on this definition. The Plan defines **Total Disability** as:

> 1. During the Elimination Period and Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the Main Duties of his or her Own Occupation.
> 2. After the Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the Main Duties of any occupation which his or her training, education or experience will reasonably allow.
>
> The loss of a professional license, an occupational license or certification, a pilot's license, or a driver's license for any reason does not, by itself, constitute Total Disability.

(*Id.* at 95, 100). Further Elimination Period is defined as:

> **ELIMINATION PERIOD** means the number of days of Disability during which no benefit is payable. The Elimination Period is shown in the Schedule of Benefits. It applies as follows:
> 1. The Elimination Period:
>    a. begins on the first day of Disability; and
>    b. is satisfied when the required number of days is accumulated within a period which does not exceed two times the Elimination Period.
>    During a period of Disability, the Insured Employee may return to work, at his or her own or any other occupation, for

10

>       an accumulated number of days not to exceed the
>       Elimination Period.
> 2.    Only days of Disability caused by the same or a related Sickness
>       or Injury will count towards the Elimination Period. Days on
>       which the Insured Employee returns to work will not count
>       towards the Elimination Period.

The Schedule of Benefits defines the **ELIMINATION PERIOD** as "180 calendar days of

Disability caused by the same or a related Sickness or Injury, which must be accumulated within

a 360-calendar day period." (*Id.* at 133). The **OWN OCCUPATION PERIOD** "means a period

beginning at the end of the Elimination Period and ending 24 months later for Insured Employees."

(*Id.*). Main duties are defined as follows:

> **MAIN DUTIES** or **MATERIAL AND SUBSTANTIAL DUTIES**
> means those job tasks that:
> 1.  are normally required to perform the Insured Employee's Own
>     Occupation; and
> 2.  could not reasonably be modified or omitted.
>
> To determine whether a job task could reasonably be modified or
> omitted, the Company will apply the
> Americans with Disabilities Act's standards concerning reasonable
> accommodation. It will apply the Act's
> standards, whether or not:
>
> 1. the Employer is subject to the Act; or
> 2. the Insured Employee has requested such a job accommodation.
> An Employer's failure to modify or omit other job tasks does not
> render the Insured Employee unable to
> perform the Main Duties of the job.
>
> Main Duties include those job tasks:
> 1. as described in the U.S. Department of Labor Dictionary of
> Occupational Titles; and
> 2. as performed in the general labor market and national economy.
> Main Duties are not limited to those specific job tasks as performed
> for a certain firm or at a certain work site.

(*Id.* at 139).

Plaintiff argues that she is disabled within the meaning of Lincoln's policy and accordingly, she is entitled to long term disability benefits under the Plan. (*See* ECF No. 25 at 17). In support, she provides numerous citations to the administrative record: the diagnoses of clinicians at Mayo Clinic; the diagnoses of her healthcare providers; the Social Security Administration's determination that she is disabled; and the statements by her employer and caregiver. (*See id.* at 7–12). Moreover, Plaintiff attacks Defendant's support for its opposite conclusion—i.e., she was not Totally Disabled—by asserting that its reviewing doctor was unqualified; his review was deficient; and the opinion ultimately contradicted the evidence in the administrative record. (*See id.* at 13–17). Plaintiff concludes that, taken together, the evidence in the administrative record establishes she is entitled to long-term benefits under Lincoln's plan.

Defendant's Motion for Judgment on the Administrative Record is more pointed: it contends that Plaintiff failed to demonstrate Total Disability on the day she stopped working and throughout the next 180 days as is required by the Plan. (ECF No. 27 at 16). According to Defendant, because Plaintiff failed to satisfy this requirement, she is not entitled to any long-term benefits under the Plan. (*See id.*). Instead, her insurance coverage ended on her last day of work. According to Defendant, Plaintiff's contemporary medical records do not support impairments during the Elimination Period. (*Id.* at 19).

Because the appropriate standard of review is *de novo*, the Court limits its review "to the record before the administrator and the court must determine whether the administrator properly interpreted the plan and whether the insured was entitled to benefits under the plan." *Hoover*, 290 F.3d at 808-09. This Court's *de novo* review of a denial of benefits "is to determine whether the administrator ... made a correct decision." *Hoover v. Provident Life and Acc. Ins. Co.*, 290 F.3d 801, 808-09 (6th Cir. 2002). To do so, this analysis will begin with a review of the Plaintiff's job,

continue with comparing the relevant record evidence with that job's occupational standard, and then, to the extent necessary, consider Plaintiff's Social Security Administration decision in light of other relevant record evidence.

## A.  Plaintiff's Job

First, a reviewing Court looks "to the nature of Plaintiff's job." *Javery v. Lucent Techs., Inc. Long Term Disability Plan for Mgmt. or LBA Emps.*, 741 F.3d 686, 701 (6th Cir. 2014); *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 618 (6th Cir. 2006).  Here, Plaintiff worked as an Account Receivables Manager for David Feldman Worldwide, a firm providing international court reporting services.  It is undisputed by the parties that this position is categorized as sedentary by exertion level.  (ECF No. 25 at 11; ECF No. 27 at 7).  According to an Occupational Analysis performed by Defendant, this position imposed certain physical, environmental and mental demands.[3]  (ECF No. 14-3 at 24). Physically, the position required plaintiff to occasionally reach and handle things; frequently talk, hear, see things close up; and tolerate moderate levels of noise intensity.  (*Id.*).  The position required certain aptitudes, including a relatively high general learning ability and verbal aptitude as well as moderate demands of numerical and clerical aptitude.  (*Id.*).  In other words, Plaintiff's former position required minimal physical activity; moderate to high aptitude abilities; and, the ability to talk frequently.  (*Id.*).

## B.  Relevant Record Evidence Measured Against the Occupational Standard.

Next, courts review the medical evidence presented in the administrative record and apply "it to the occupational standard." *Javery*, 741 F.3d at 701; *Elliott*, 473 F.3d at 618.  This allows the Court to ascertain what this administrative record is missing: an evaluation of Plaintiff's functional capacity based on the medical evidence.  It is important to note that Plaintiff has the

---

[3] This is the only Occupational Analysis offered in the record.  (*See* ECF No. 14-3 at 24). As such, it, among other descriptions of the position, will be used to determine the relevant "occupational standard."

burden of showing that she is disabled within the meaning of the Plan. *Harrison*, 2020 WL 1030897, at *4, *appeal dismissed*, 2020 WL 5904432, *and aff'd*, 856 F. App'x 574 (citing *Javery*, 741 F.3d at 700-01).

Before delving into the medical evidence, however, it is important to recall what precisely Plaintiff must demonstrate as a threshold matter before being considered Totally Disabled within the meaning of the Plan. Before Plaintiff is eligible for long-term disability benefits, she must show that she was Totally Disabled from her Own Occupation during the Elimination Period. Recall that the Elimination Period for this Plan is the first 180 to 360 days following the onset of her disability. (ECF No. 14-2 at 90, 92) ("180 calendar days of Disability caused by the same or a related Sickness or Injury, which must be accumulated within a ***360-calendar day*** period.") (emphasis added). And although the parties do not dispute that this time period runs from July 18, 2016, to January 15, 2017, the plan clearly allows Plaintiff until July 13, 2017 – the full 360-day period following the date of disability. (*See id.*).

Plaintiff did not need to show that she was continuously disabled throughout this period; rather, she needed to demonstrate that she was disabled for 180 calendar days within that 360-calendar day period. (*See id.* at 134) ("The Elimination period … is satisfied when the required number of days [180] is accumulated within a period which does not exceed two times the Elimination Period."). Accordingly, despite the parties focus on the first 180-day time frame, Plaintiff had approximately one year to demonstrate 180 calendar days of disability from the same disability. Yet, under either the shortest or longest versions of the possible Elimination Periods under the Plan, Plaintiff simply fails to demonstrate by a preponderance of the evidence that she is Totally Disabled from her Own Occupation. As such, this Court cannot reach any other

conclusion than that the Plan administrator "made a correct decision." *Hoover*, 290 F.3d at 808–09.

Here, the medical evidence in the administrative record demonstrates that Plaintiff was diagnosed with fibromyalgia and chronic fatigue syndrome in late 2016 by clinicians at the Mayo Clinic. Yet, a diagnosis does not necessarily compel a finding of total disability under any Plan, let alone the Plan at issue. (*See* ECF No. 27 at 2) (citing *Minutello v. Hartford Life & Accident Co.*, 964 F. Supp.2d 491, 508 (W.D. Penn. 2013)); *Ward v. Astrue*, No. CIV. 09-212-ART, 2010 WL 4000247, at *5 (E.D. Ky. Oct. 12, 2010) (If [decision makers] were not permitted to consider objective evidence at any stage of the game, fibromyalgia patients would be virtually per se disabled—despite the Sixth Circuit's rule to the contrary. (citing *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008)). Plaintiff does not press this argument. Thus, it is up to Plaintiff to demonstrate that the specifics of her condition limit her functional capacity as is consistent with Circuit's guidance. *See Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 618 (6th Cir. 2006) ("medical data, without reasoning, cannot produce a logical judgment about a claimant's work ability.") Plaintiff fails to meet her burden.

Following her diagnosis, Plaintiff provided five additional discrete medical records: her four visits with her primary care physician and her encounters with her physical therapist. Dr. Swift, her primary care physician, never opines directly on her functional capacity. Dr. Swift's findings are inconsistent with Plaintiff's claims of constant fatigue and pain she alleges to experience. For example, in her first visit with Dr. Swift following her diagnosis plaintiff claimed she felt well with minor complaints. Additionally, Dr. Swift documented a lack of back pain and joint pain. Further Plaintiff had five out of five normal muscle strength in her extremities. Finally, she reported she was also exercising.

The time spent with her physical therapist does little to help Plaintiff in meeting her burden: demonstrating that she was Totally disabled for 180-days within 360. Over a two-week period, Plaintiff attended two physical therapy sessions per week. Notably, in three of the four sessions she self-reported having no pain. Equally important, she demonstrated a capacity to engage in significant exercising. This suggested at the very least that her extreme fatigue abated or was surmountable during these forty-five-to-fifty-five-minute physical therapy sessions. Although the record shows that her physical therapist planned on treatment for nine to ten weeks, plaintiff ended her treatment after two. And notwithstanding the fact that she contends that the physical therapy made her condition worse, the Social Security Administration represented she cancelled her treatment because she thought she could replicate it at a fitness center. Overall, this portion of the record while possibly consistent with a fibromyalgia diagnosis generally does not assist the Court in finding a lack of functional capacity.

Considered together, the two most severe symptoms of her diagnosis—pain and fatigue—are somewhat undermined by her own representations and/or physical performance during therapy. Her cognitive capacity also does not appear so impaired to support a finding of total disability. For example, when plaintiff visited Dr. Swift her ability to concentrate was specifically noted as not being adversely affected by her condition. Plaintiff does not represent that the any of the interventions she is pursuing (medicine, treatment, etc.) is somehow affecting her cognitive functioning. The only evidence that supports Plaintiff's self-asserted inability to work is her own representations and that of her close friend Mr. Brian Hood.

Although this Court agrees with the general proposition Plaintiff advances—that lay people are competent to provide testimony generally—this conclusion does not render such evidence conclusive. Instead, this evidence is only one piece of the puzzle. Mr. Hood provided an affidavit

explaining the gradual degradation of plaintiff's condition from energetic to dependent.  (ECF No. 14-2 at 286).  He describes their journey from the emergency room, to the Mayo Clinic, to the physical therapist, and many primary care physicians in between.  (*Id.*).  Yet his representations, providing general background information about Plaintiff's experiences, do not overcome the inconsistencies in the records she proffered for her disability claim.

Plaintiff's own representations do not provide a sufficient basis for finding total disability under the plan.  Instead, they demonstrate that she was diagnosed with what can be a debilitating condition: fibromyalgia and chronic fatigue syndrome.  It appears that on some of the days during the Elimination Period she experienced severe symptoms. On other days, however, by her own admission it appears she did not. Because it was Plaintiff's burden to demonstrate that she was totally disabled for at least 180 days during the Elimination Period, the evidence she produced is insufficient.

Although Plaintiff critiques Defendant's insistence upon objective medical evidence, she could have met her burden with objective evidence of her functional capacity.  As this Court recognizes the difficulty in "proving" a diagnosis of fibromyalgia or chronic fatigue syndrome through traditional medical methods, the functional capacity exam provides an important tool in such a Plaintiff's toolbox.  *Ward*, 2010 WL 4000247, at *5 (citing *Huffaker v. Metro. Life Ins. Co.*, 271 F. App'x 493, 500 (6th Cir.2008) ("But as a panel of the Sixth Circuit recently held, it is appropriate to consider objective evidence of the ultimate claim that a patient's properly-diagnosed fibromyalgia was actually disabling—objective evidence of the "physical limitations imposed by the symptoms of the illness."); *Barnes v. Unum Life Ins. Co. of Am.*, No. 1:19-CV-138, 2020 WL 10221073, at *3 (E.D. Tenn. Nov. 24, 2020) (citing *Huffaker*, 271 F. App'x at 499–500) ("Even when a plaintiff is unable to show objective evidence of a medical condition (for example, for

17

debilitating pain or fibromyalgia), a plaintiff may still be required to show objective evidence of a disability or inability to perform work.  One method of objective proof of disability, for instance, is a functional capacity evaluation, a 'reliable and objective method of gauging' the extent one can complete work-related tasks.").

Though this Court is reluctant to say that such evidence is required when attempting to demonstrate restrictions and limitations for such "subjective" conditions, it is easy to see the benefit of such evidence.  The absence of a functional capacity exam and an unwillingness or inability of her providers to give her some sort of physical restriction and limitation opinion makes this a difficult objective for Plaintiff to achieve.  Unfortunately for Plaintiff, her insistence on relying on the opinions of doctors outside of the Elimination Period (after July 2017) does not help her make her case in proving the restrictions and limitations of a disability that generally obviates objective medical proof. [4]  Thus, any opinions rendered after July of 2017 provided here do not assist the Court in its analysis of the threshold question: whether Plaintiff was totally disabled because of fibromyalgia and chronic fatigue syndrome during the Elimination Period.

Upon review of the relevant evidence in the administrative record, Plaintiff has failed to meet her burden of demonstrating that she was disabled from her own occupation for at least 180 days during the 180-to-360-day period following the onset of her disability.  Her favorable Social Security Administration decision does not alter this result.

### C.  Social Security Decision

First, it is well settled that plan administrators—and by extension, reviewing courts—are not bound by SSA determinations. *Bustetter v. Standard Ins. Co.*, 529 F. Supp. 3d 693, 707 (E.D.

---

[4] Plaintiff offers Dr. Wedner's September 13, 2017 Attending Physician Statement as evidence that she was totally disabled within the Elimination Period. First, this statement was rendered outside of the relevant time period. Second, even if it were timely, he simply says that Plaintiff is "unable to function normally."  This statement, on its own, does little to advance Plaintiff's cause.  (*See* ECF No. 14-3 at 45).

Ky. 2021), *aff'd*, No. 21-5441, 2021 WL 5873159 (6th Cir. Dec. 13, 2021) (citing *Cox v. Std. Ins. Co.*, 585 F.3d 295, 303 (6th Cir. 2009)) ("[A]dministrators are not bound by the Social Security Administration's determination.").

Second, courts do not always need to consider such determinations. Although it is the general rule that such determinations are not "meaningless," *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 294 (6th Cir. 2005), in many instances, plans may *ignore* it. The clearest example is when plans do not require a claimant to apply for Social Security. *See Autran v. Procter & Gamble Health & Long-Term Disability Benefit Plan*, 27 F.4th 405 (6th Cir. 2022) (citing *Bennett v. Kemper Nat. Servs., Inc.*, 514 F.3d 547, 553–54 (6th Cir. 2008)). But when Plans do require plaintiffs to apply for Social Security, Plans may not ignore it. *Id.* ("[Plaintiff] cites our cases holding that an administrator cannot ignore a federal disability finding if the plan requires a participant to apply for Social Security benefits and if such a federal award helps the plan (by reducing the amount that it owes the participant)"). Here, however, the Plan requires claimants to apply for Social Security benefits (*See* ECF No. 14-2 at 117); thus, a Plan administrator may not ignore it. Although it is not clear if the consequences of this Plan feature requires a reviewing Court to consider the decision, it is best practice to address this decision.

Even considering the decision, it does not alter this Court's conclusion. For one, this Court may depart from the SSA's conclusion, especially when the evidence relied upon is different and it rationally explains its departure. *See Autran*, 27 F.4th at 417. That said, it is important to start with the portions of the SSA's decision that are consistent with this Court's evaluation. In making its decision, the ALJ noted that Plaintiff has "no limitations in understanding, remembering, or applying information, no limitations in interacting with others, no limitation in concentrating, persisting, or maintaining pace, and no limitations in adapting or managing oneself." (ECF No.

14-3 at 71).   Thus, this Court's opinion regarding Plaintiff's cognitive capacities and mental functioning is consistent with the SSA decision.

Having dealt with the mental aspects of her occupation (*see supra*), it is important to address the SSA's opinion on the two most pertinent symptom categories: pain and fatigue.  For one, the SSA found that she has "the residual functional capacity to perform sedentary work," with the following exceptions:

> she can occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds, occasionally balance, stoop, crouch, and never kneel or crawl. She must avoid concentrated exposure to extreme heat, extreme cold, humidity, wetness, vibration, and have no more than occasional exposure to respiratory irritant such as fumes, odors, dust, gases, and poor ventilation, and all exposure hazards such as dangerous machinery, and unprotected heights.  She should have no exposure to loud noise (as defined in the selective Selected Characteristics of Occupations), must be able to use a wheelchair to ambulate, and would be off task 15 percent of the work day.

(ECF No. 14-3 at 72).  The above restrictions and limitations are fully consistent with Plaintiff's own occupational demands.  Accordingly, despite making findings that appear strikingly consist with this Court's conclusions, the ALJ found that Plaintiff did not have the residual functional capacity to perform her own occupation.  (*Id.* at 74).

It is possible that this difference in opinion could be attributable to the fact the ALJ considered evidence from significantly after the Elimination Period—(one January 2018 doctor visit and two April 2018 doctor visits)—to supplement their record.  (*Id.* at 74).  This, of course, suggests that this information played a role in reaching the conclusion that Plaintiff was disabled under the SSA's definition.  Other than asserting that the SSA considered this, however, Plaintiff does not persuasively argue how this information (additional self-reporting of symptoms during a time-period outside of the Elimination Period) assists this Court in determining functional capacity from July 2016 to July 2017.  As previously discussed, although fibromyalgia and chronic fatigue

syndrome often elude detection by objective medical tests, it is more than feasible to demonstrate functional capacity. Thus, despite the ALJ's conclusion that Plaintiff is disabled under standards promulgated by the Social Security Administration, this Court for the reasons set forth herein, finds Plaintiff is not disabled under the Plan at issue. (*Id.*).

This divergence of opinion primarily rests on the failure of the proffered evidence to demonstrate by a preponderance of the evidence that she was totally disabled for at least 180 days over the entirety of the Elimination Period. Because this Court agrees with the mental functioning and cognitive capacity assessments of the SSA, the difference of the opinion can be attributed to this Court's assessment of Plaintiff's pain and fatigue symptoms. The share of the provided self-representations Plaintiff made to her treating providers undermines the inference that she was suffering from such constant pain and fatigue—at least to conclude that she was suffering from these ailments for at least 180 days—as represented by her and Mr. Hood elsewhere in the record. Taken together, this Court finds that Plaintiff failed to meet her evidentiary burden during the Elimination Period and the SSA decision does not alter this result.

## IV.   CONCLUSION

For the foregoing reasons, Defendant's Motion for Judgment on the Administrative Record (ECF No. 26) is **GRANTED** and Plaintiff's Motion (ECF No. 25) is **DENIED**. This case is hereby **DISMISSED**.

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATE: March 29, 2022**